UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

ARON ALAN, LLC, and
ARON SCHROTENBOER,

        Plaintiffs,

v.                                                                                    Case No.  1:04-CV-816

TANFRAN, INC. and                                                    HON. GORDON J. QUIST
BRYAN PUNTURO,

        Defendants.
_____/

## **OPINION**

Plaintiffs, Aron Alan, LLC ("Aron Alan") and Aron Schrotenboer ("Schrotenboer"), have sued Defendants, Tanfran, Inc. ("Tanfran") and Bryan Punturo ("Punturo"), alleging a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 to 1968, and state law claims for fraud in the inducement, fraud, breach of express contract, breach of implied contract, unjust enrichment, and violation of the Michigan Franchise Investment Law ("MFIL"), M.C.L. §§ 445.1501 to .1546.  Plaintiffs' claims arise out of their purchase of four Mirage tanning franchises from Defendants.  Plaintiffs filed their complaint in the Northern District of Indiana, but on December 1, 2004, that court granted Defendants' motion to transfer the case to this Court.[1]  Now before the Court are Defendants' motion for summary judgment and Defendants' motion to exclude the affidavit of Plaintiff's counsel, Grant A. Liston.  For the reasons stated below, the Court will grant the motion for summary judgment, dismiss the motion to exclude as moot, and dismiss Plaintiffs' claims with prejudice.

---

[1] The complaint also included two other plaintiffs as to whom the case was not transferred.  In addition, the complaint included two claims under Indiana law, Counts V and VI, which the parties agree are not part of this case and should be dismissed.

**I. Facts**

Tanfran is a franchisor offering Mirage Tanning Center franchises. Punturo is the sole officer of Tanfran. Aron Alan is a Mirage Tanning Center franchisee, and Schrotenboer is Aron Alan's sole member. Schrotenboer is a resident of Rockford, Michigan.

Schrotenboer first became interested in a Mirage franchise in early 1999. Schrotenboer's friend, Todd Hulst, owned a Mirage franchise on 28th Street in Grand Rapids, Michigan, and told Schrotenboer that his franchise made money. Schrotenboer had a couple of conversations with Hulst about the franchise and he also spoke with Brent Bolt, who owned a Mirage franchise in Jenison, Michigan. Eventually, Schrotenboer met with Punturo. The meeting occurred sometime during the late winter or early spring of 1999 at the Plainfield Avenue franchise location in Grand Rapids, which Punturo owned at that time. Schrotenboer's father, who owned several hotel franchises, and an associate of Punturo's father also attended the meeting. The purpose of the meeting was to discuss the options of purchasing the Plainfield Avenue franchise and of opening a new franchise location.

During the meeting, Punturo provided certain financial information for the Plainfield Avenue store to Schrotenboer, which included a profit and loss statement for 1998 and a profit and loss statement for January and February of 1999. The 1998 profit and loss statement showed total income of $152,659.56, and the January and February 1999 profit and loss statement showed total income of $40,014.49. (Schrotenboer Dep. Ex. 71.) The profit and loss statements were discussed during the meeting, and Schrotenboer and his father made handwritten notes on them. On the 1998 profit and loss statement, someone, apparently Schrotenboer's father, altered "January through December 1998" by crossing out "January" and writing "March" below January, although the word "March" has lines drawn through it. At the bottom of the document, Schrotenboer's father made the

2

notation "$ 45,446 Real Net March-Dec."[2] Below that notation, he wrote "+23,255 Jan + Feb," and at the very bottom, he wrote "$68,701.00 12 Month Net." The 23,255 figure used for January and February for the "12 Month Net" was taken from the separate profit and loss statement for January and February of 1999.

On April 9, 1999, after the meeting, Punturo mailed additional information to Schrotenboer that included a franchise offering circular, Tanfran's statement of operations and balance sheet for 1997, a franchise presentation outline (the "Outline"), and a "Sheet 13" showing sales generated by the Plainfield location. Paragraph D.2. of the Outline listed the 1998 income for the Fort Wayne location as $435,000, the 1998 income for the Plainfield Avenue location as $325,000, and the 1998 income for the Grand Rapids (28th Street) location as $425,000. The Sheet 13 listed total sales at the Plainfield location as $181,357 for 1997 and $43,066 for 1998. (Schrotenboer Aff. ¶ 4 & Ex. A.) It also broke down sales by month. For 1997, the Sheet 13 showed sales from March through December, and for 1998, it showed sales only for January and February. (Id.) Finally, it included a graph at the bottom showing sales for twelve months, using the January and February 1998 sales for the first two months and March through December 1997 sales for the last ten months. (Id.)

In February 2000, Schrotenboer, through Aron Alan, signed a franchise agreement with Tanfran for a Mirage tanning salon franchise in Rockford, Michigan. Prior to signing the franchise agreement, Schrotenboer had received and reviewed a copy of the franchise agreement. (Schrotenboer Dep. at 42-43.) Schrotenboer also reviewed the other documents that Tanfran and Punturo had provided to him, including the offering circular and financial documents. (Id. at 43-44, 163.) By signing the franchise agreement, Schrotenboer acknowledged that Tanfran and Punturo had

---

[2] Schrotenboer testified that his father made these notes. (Schrotenboer Dep. at 31.)

3

not made "assurances or guarantees concerning the profitability of [the] proposed business." (Rockford Franchise Agreement ¶ 23.3.)

Schrotenboer opened the Rockford franchise in February 2000. Pursuant to the franchise agreement, he received policy and operations manuals to assist him in operating the store. The performance of the store was "good," (id. at 73-74), and in September of 2000, Schrotenboer signed another franchise agreement for a franchise in Cadillac, which opened for business in February 2001. On the same day that he signed the Cadillac franchise agreement, Schrotenboer and a partner, Brent Bolt, signed an agreement for a third franchise located in Standale, Michigan. Schrotenboer purchased Bolt's interest in the Standale franchise on February 28, 2001. Finally, on January 15, 2002, Schrotenboer signed a franchise agreement for a fourth franchise located in Grand Rapids on East Beltline Avenue. Schrotenboer subsequently relocated the franchise to Alpine Avenue, its current business location.

Schrotenboer alleges that until 2004, he had no reason to believe that the numbers Defendants provided him in 1999 were misrepresented. (Id. at 55.) Schrotenboer states that in the summer of 2004, John Bush, another Mirage franchisee, showed him a profit and loss statement for the Plainfield Avenue location for 1998, which showed a "gross profit" of $181,000.[3] (Id.) Plaintiffs stopped paying royalties to Tanfran on August 29, 2004, and they filed the instant suit on September 7, 2004. According to Plaintiffs' expert, Larry Roslund, the information from Tanfran's Quick Books file shows the gross income of the Fort Wayne location for 1998 as $323,161.63; the gross income of the Plainfield Avenue location for 1998 as $153,659; and the gross income from the Grand Rapids 28th Street location for 1998 as $260,136.32. (Roslund 12/22/05 Expert Report,

---

[3]Schrotenboer apparently was not asked to explain the term "gross profit," and counsel did not attempt to clarify this term in their briefs. The Court understands Schrotenboer to be referring to gross income. This conclusion is supported by the parties representations that records produced during the course of discovery show that 1998 sales for the Plainfield franchise were approximately $181,000.

4

Roslund Aff. Ex. A, Pls.' Ex. 5.) Schrotenboer continues to operate all four franchises under the Mirage mark, and Schrotenboer admits that the franchises are currently worth more than he spent in building and equipping them. (Schrotenboer Dep. at 164-65.)

## II. Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. Id.

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Agristor Financial Corp. v. Van Sickle, 967 F.2d 233, 236 (6th Cir. 1992)(quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

## III. Discussion

Defendants argue that they are entitled to summary judgment on all of Plaintiffs' claims for various reasons. First, they argue that Plaintiffs' RICO, MFIL, and fraud claims must be dismissed because they are time-barred and because Plaintiffs cannot show that any reliance on the alleged misrepresentations was reasonable. Second, Defendants contend that Plaintiffs' breach of express contract claim must be dismissed because Plaintiffs failed to provide Tanfran with written notice of the alleged breaches, as required by the franchise agreement, and because Plaintiffs cannot show that they suffered damages as a result of the breaches. Third, Defendants argue that Plaintiffs' breach of implied contract claim fails because the franchise agreement is valid and, therefore, as a matter

5

of law, no implied contract claim is permitted. Finally, Defendants contend that even if Plaintiffs' fraud and MFIL claims survive, Plaintiffs cannot obtain rescission of the franchise agreements because Plaintiffs failed to rescind the franchise agreements in a timely manner and were in default under those agreements when they attempted to rescind them.

**A.     Plaintiffs' Fraud, MFIL, and RICO Claims Fail Because Plaintiffs' Alleged Reliance Was Unreasonable As A Matter Of Law**

"Under Michigan law, reasonable reliance is an essential element of a fraud claim." In re Jackson Nat'l Life Ins. Premium Litig.,107 F. Supp. 2d 841, 865 (W.D. Mich. 2000) (citing Novak v. Nationwide Mut. Ins. Co., 235 Mich. App. 675, 689-90, 599 N.W.2d 546, 553-54 (1999)). See also Nieves v. Bell Indus., Inc., 204 Mich. App. 459, 464, 517 N.W.2d 235, 238 (1994) ("A misrepresentation claim requires reasonable reliance on a false representation."). A plaintiff may not claim fraud where he ignored information that was available to him from which he could have determined that a representation was not true. See Nieves, 204 Mich. App. at 464, 517 N.W.2d at 238 ("There can be no fraud where a person has the means to determine that a representation is not true."). In Webb v. First of Michigan Corp., 195 Mich. App. 470, 491 N.W.2d 851 (1992), the plaintiffs alleged that the defendant gave fraudulent investment advice because their broker had stated that the investment was "risk-free" with a "guaranteed" rate of return. The court held that the statement regarding the rate of interest was nothing more than a promise of future conduct that could not constitute fraud, but that the statement about the investment being "risk-free" could form the basis of a fraud claim. Id. at 474, 491 N.W.2d at 853. The court observed, however, that "there can be no fraud where the means of knowledge regarding the truthfulness of the representation are available to the plaintiff and the degree of their utilization has not been prohibited by the defendant." Id. The court observed that the plaintiffs had received a prospectus and other documents

6

highlighting the risky nature of the investment, including the possibility of losing the entire investment. See id. at 474, 491 N.W.2d at 853-54. The court observed: "Even a cursory review of any of these documents would have enlightened plaintiffs that the investment was not "risk free" as represented by the broker. Accordingly, we hold that plaintiffs cannot claim to have been defrauded when they had information available to them that they chose to ignore." Id. at 475, 491 N.W.2d at 854. Similarly, in Schuler v. American Motors Sales Corp., 39 Mich. App. 276, 197 N.W.2d 493 (1972), the court held that the plaintiff could not establish fraud with regard to the defendants' representations in connection with his purchase of a car dealership. The plaintiff alleged that the defendants made misrepresentations regarding the size of the new car inventory and value of the parts and accessories inventory. The court held that the plaintiff could have discovered the truth of the alleged misrepresentations from schedules that the defendants provided to the plaintiff in connection with the sale. Id. at 279, 197 N.W.2d at 495. The court observed that the "[p]laintiff either knew or could readily have discovered every material fact that was known by defendants at the time of the sale." Id. at 280, 197 N.W.2d at 495. See also Dickshott v. Angelocci, No. 241722, 2004 WL 1366001, at *12-13 (Mich. Ct. App. June 17, 2004) (per curiam) (holding that the plaintiff could not maintain a claim for fraud where he had information available to him regarding the truth of the defendant's misrepresentations about future life insurance premiums).

In this case, Plaintiffs contend that Defendants made material misrepresentations when Punturo provided Schrotenboer the Outline, which stated that the Plainfield Avenue location had 1998 income of $325,000 (when in fact it only had $153,654 in income), that the Fort Wayne location had 1998 income of $435,000 (when in fact in only had $323,161.63 in income), and that the Grand Rapids 28th Street location had 1998 income of $425,000 (when in fact it only had

7

$260,136 in income); and when Punturo provided Schrotenboer the Sheet 13, which represented that the Plainfield Avenue location had sales of $181,357 in 1997, when the store was not even open in 1997.

Given the conflicting information that Schrotenboer possessed, the Court concludes that no reasonable person would have relied upon any of it without making further inquiry of Defendants to ascertain the true facts. In the initial meeting, Punturo gave Schrotenboer and his father profit and loss statements for 1998 and for January and February of 1999, which showed that the Plainfield Avenue location had total income of $152,659 for 1998 and total income of $40,014.49 for January and February of 1999. The handwritten notes on both of those statements, which Schrotenboer admitted were made by his father, show that the parties discussed that the 1998 statement only covered March through December of 1998 and that Schrotenboer's father used his own net income calculation from the January and February 1999 profit and loss statement to calculate twelve months of net income (added to the ten months of 1998). Following the meeting, Punturo sent Schrotenboer the Outline, which indicated that the 1998 income for the Plainfield Avenue location was more than double the income reported on the 1998 profit and loss statement, and the Sheet 13, which showed sales of $181,357 for March through December of 1997 and sales of $43,066 for January and February of 1998 for the Plainfield Avenue location. The graph at the bottom of the page, for some reason, shows twelve months of sales using the January and February 1998 sales as the first two months and the March through December of 1997 sales for the last ten months. Schrotenboer possessed sufficient information to determine that the figures in the Outline and the Sheet 13 were probably not accurate. Upon comparing the Sheet 13 and the Outline to the profit and loss statements, a reasonable person would have been prompted to inquire of Defendants which gross

8

income figure for 1998 was correct – the $152,659.56 figure from the 1998 profit and loss statement; the $325,000 figure from the Outline; or the $43,066 figure from the Sheet 13. A reasonable person also would have inquired why the Sheet 13 did not show sales for March through December of 1998 and why, if there were sales for March through December of 1997 and for January and February of 1998, Defendants did not have profit and loss statements for those periods (such an inquiry likely would have disclosed that the 1997 sales on the Sheet 13 were actually the 1998 sales and that the 1998 sales on the Sheet 13 were actually the 1999 sales because the Plainfield Avenue location was not open in 1997).[4] Given the widely divergent figures presented to Schrotenboer, he could not have reasonably relied upon any of the figures and should have made further inquiry. The same is true for the 1998 income figures for the Fort Wayne and Grand Rapids 28th Street locations in the Outline, even though Schrotenboer did not have conflicting figures for those stores, because the information that he possessed would have prompted a reasonable person to question the accuracy of the income figures in the Outline.

Plaintiffs' MFIL and RICO claims fail for the same reason. That is, reasonable or justifiable reliance is a necessary element for an MFIL claim. See Cook v. Little Caesar Enters., Inc., 210 F.3d 653, 659 (6th Cir. 2000). Similarly, reasonable reliance is an element of a RICO claim where mail fraud or wire fraud is alleged as a predicate offense. See Bender v. Southland Corp., 749 F.2d 1205, 1216 (6th Cir. 1984) (affirming dismissal of the plaintiff's RICO claim where the complaint failed to "allege what misrepresentations (or omissions) of material fact Southland made to the plaintiffs that they reasonably relied upon to their detriment"); Taylor Group v. ANR Storage Co., 24 Fed. App'x 319, 323 (6th Cir. 2001) ("The adjudicated fact that Plaintiffs' reliance was unreasonable

---

[4]In light of the discussions during the initial meeting, Schrotenboer should have known that the Sheet 13 was inaccurate because the Plainfield Avenue location was not open during 1997.

9

precludes a finding of Plaintiffs' reasonable reliance on Defendant's alleged mail and wire fraud, which is an essential element of Plaintiff's RICO claim.").[5]

Because the Court concludes that any reliance by Plaintiffs was unreasonable, the Court finds it unnecessary to address Defendants' statute of limitations arguments.

**B.     Plaintiffs' Breach of Contract Claim Fails Because Plaintiffs Suffered no Damages as a Result of the Alleged Breaches**

Plaintiffs allege that Tanfran breached Section 5.4 of the franchise agreements, which requires the franchisor to provide additional training for five days at the franchisee's location once the location is ready to open. (Franchise Agreement § 5.4.) In addition, Plaintiffs allege that Tanfran breached Section 5.6 of the franchise agreements, which requires the franchisor to provide continuing consulting service on the operation of the business by, at the franchisor's direction, providing assistance by telephone, providing written updates on policies and standards, or holding periodic meetings. (Id. § 5.6.)

Plaintiffs' breach of contract claim fails because "a showing of damages is a necessary element in a claim for breach of contract." Borlack v. Mackler Bros., Inc., No. 181281, 1996 WL 33360419, at *3 (Mich. Ct. App. Aug. 20, 1996) (per curiam) (citing Lawrence v. Will Darrah & Assocs., Inc., 445 Mich. 1, 6-8, 516 N.W.2d 43, 45-56 (1994)); see also Stoken v. JET Elecs. &

---

[5]In light of the Court's conclusion that any reliance by Plaintiffs upon the information Defendants provided to them was unreasonable because of the discrepancies in the information provided by Defendants, the Court need not address Defendants' alternate ground that the integration clause in the franchise agreement made any reliance unreasonable. The Court notes, however, that Defendants' counsels' presentation of their integration clause argument, which omitted a material portion of the integration clause making certain specified and unspecified documents a part of the franchise agreement, comes close to violating Michigan Rule of Professional Conduct 3.3, which requires candor toward the tribunal. The omission was material because, as the product of poor draftsmanship, the particular sentence creates the potential for expanding the scope of the franchise agreement, rather than limiting it, as is the usual purpose of an integration clause. The inclusion of the language omitted by Defendants' counsel could have undermined Defendants' argument. Counsel have an obligation to this and every other court to fairly present the facts of the case. Even if Defendants' counsel believed that the omitted language would not affect the application of the integration clause, they should have realized that omitting it was, at best, misleading.

10

Tech., Inc., 174 Mich. App. 457, 463, 436 N.W.2d 389, 392 (1988) (per curiam) (noting that to establish her breach of implied contract claim, the plaintiff was required to prove the existence of the contract, a breach of that contract, and damages). Schrotenboer testified that each franchise is worth more than he spent to open it. (Schrotenboer Dep. at 164-65.) Moreover, Plaintiffs have not offered any evidence showing that they have suffered damages as a result of Tanfran's alleged failure to provide additional training and to provide continuing consulting service. Although Plaintiffs have presented evidence on damages from their expert, Larry Roslund, the damages identified in his report concern damages based upon rescission of the franchise agreements, not the alleged breaches of the franchise agreements. Therefore, Defendants are entitled to summary judgment on this claim.

**C.      Plaintiffs Cannot Maintain Claims for Breach of Implied Contract and Unjust Enrichment Because An Express Contract Covers the Subject Matter**

Plaintiffs assert claims of breach of implied contract and unjust enrichment in Counts III and VIII of their complaint based upon Defendants' alleged failure to provide franchise services to Plaintiffs. A plaintiff may assert a claim for unjust enrichment by alleging that: (1) the defendant received a benefit from the plaintiff; and (2) an inequity will result because of the defendant's retention of the benefit. Barber v. SMH (US), Inc., 202 Mich. App. 366, 375, 509 N.W.2d 791, 796 (1993). Under those circumstances, the law will imply a contract in order to prevent unjust enrichment. Id. "However, a contract will be implied only if there is no express contract covering the same subject matter." Id. See also Martin v. E. Lansing Sch. Dist., 193 Mich. App. 166, 177-78, 483 N.W.2d 656, 661 (1992) (stating that a contract will be implied to prevent unjust enrichment "only if there is no express contract"). In this case, there are express contracts covering the franchisor-franchisee relationship between the parties for each of the four locations. Moreover, the Court has already rejected Plaintiffs' MFIL and fraud claims that would allow them to void the

11

franchise agreements, and Plaintiffs have offered no other basis for concluding that the franchise agreements are not valid.  The cases Plaintiffs cite, <u>Keywell and Rosenfeld v. Bithell</u>, 254 Mich. App. 300, 657 N.W.2d 759 (2002) (per curiam), and <u>H.J. Tucker & Associates, Inc. v. Allied Chucker and Engineering Co.</u>, 234 Mich. App. 550, 595 N.W.2d 176 (1999), are inapposite, because in both of those cases the existence of an express contract was an issue of fact, thus permitting an alternative breach of implied contract claim.  <u>See</u> <u>Keywell & Rosenfeld</u>, 254 Mich. App. at 328-30, 657 N.W.2d at 776-77; <u>H.J. Tucker & Assocs., Inc.</u>, 234 Mich. App. at 573-74, 595 N.W.2d at 188. Unlike those cases, there is no question in this case regarding the existence of an express contract. Therefore, summary judgment is proper on those claims.

**D.     Plaintiffs are not Entitled to the Remedy of Rescission**

Defendants argue in their motion that Plaintiffs are not entitled to rescission of the franchise agreements because they failed to comply with the requirements for seeking rescission under Michigan law.  While the Court agrees with Defendants that there are independent reasons on the merits for denying Plaintiffs the remedy of rescission, the Court need not address those grounds in light of its conclusion that Plaintiff's MFIL and fraud claims fail for lack of reasonable reliance, thus precluding any basis for rescission.

### IV. <u>Conclusion</u>

For the foregoing reasons, the Court will grant Defendants' motion for summary judgment on all claims.  The Court will dismiss Defendants' motion to strike the affidavit of Plaintiffs' counsel as moot.

An Order consistent with this Opinion will be entered.

Dated: February 8, 2006                                      /s/ Gordon J. Quist
                                                             GORDON J. QUIST
                                          UNITED STATES DISTRICT JUDGE